

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-25-1997

# In Re: Grand Jury (Pt. I)

Precedential or Non-Precedential:

Docket 97-7016,97-7017

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation
"In Re: Grand Jury (Pt. I)" (1997). *1997 Decisions.* Paper 90.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/90

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NOS. 97-7016 and 97-7017

IN RE:  GRAND JURY

On Appeal From the United States District Court
For the District of Delaware
(D.C. Miscellaneous Action No. 96-mc-00093)

Argued March 26, 1997

BEFORE:  SLOVITER, Chief Judge, STAPLETON and
         ALDISERT, Circuit Judges

(Opinion Filed April 25, 1997)

Gregory M. Sleet
United States Attorney
Colm F. Connolly (Argued)
Assistant U.S. Attorney
Office of the U.S. Attorney
Chemical Bank Plaza - Suite 1100
1201 Market Street
P.O. Box 2046
Wilmington, DE 19899-2046
Attorneys for Appellee in
Nos. 97-7016 and 97-7017

Charles M. Oberly, III (Argued)
Oberly, Jennings & Drexler
800 Delaware Avenue
P.O. Box 2054
Wilmington, DE 19899
Attorney for Appellant in
No. 97-7016

Catherine M. Recker (Argued)
Aeryn S. Fenton
Welsh & Recker
1818 Market Street - Suite 3402
Philadelphia, PA 19103
Attorneys for Appellant in
No. 97-7017

1

STAPLETON, Circuit Judge:

We are here asked to decide whether a victim of a privately executed wiretap[1] can successfully move to quash a subpoena duces tecum directing the perpetrator of the wiretap to convey recordings of unlawfully intercepted communications to a grand jury. The district court denied the motions to quash. Since disclosure of the unlawfully intercepted communications to the grand jury would violate an explicit congressional prohibition, and enforcement of the subpoena would involve the courts in a violation of the victims' statutory privacy rights, we will reverse the district court and remand with orders that the subpoena duces tecum be quashed.

## I. Background

### A. Factual and Procedural History

Because this case relates to an ongoing grand jury proceeding, we will not refer to the parties by their proper names. We will also limit our recitation of the facts to the minimum necessary to explain and resolve the issues presented. Fortunately, the relevant facts are undisputed.

---

[1] "Wiretapping" is a general term used to refer to all types of illegal interceptions, including surreptitious recording of telephone conversations.

Appellant-intervenor John Doe 1 is the target of a federal grand jury investigation (hereinafter "Doe 1" or "the target"). Doe 1 lived for some time with his brother, John Doe 2 ("Doe 2" or "the husband"), and his brother's wife, John Doe 3 ("Doe 3" or "the witness"). For reasons that we need not detail, the witness installed devices on her home telephones that intercepted and recorded telephone conversations initiated from and coming into the home. Both the target and the husband were parties to some of these conversations. Neither the target nor the husband knew that their conversations were being intercepted and recorded, so neither therefore consented to the interception and recording.

Several weeks after the last conversation was recorded, appellee, the United States ("the government"), learned through an informant that the witness possessed tapes containing recordings of conversations involving the target and the husband. The grand jury issued two subpoenas directed to the witness: a subpoena ad testificandum, requiring her to appear and answer questions before the grand jury, and a subpoena duces tecum, requiring her to produce the tapes so they may be played for the grand jury. Only the subpoena duces tecum is involved in this appeal.[2]

---

[2]In a related case, In re Grand Jury, No. 97-7018, this court denied the witness' motions to quash both of the subpoenas. The witness had moved to quash on the basis of the privilege against adverse spousal testimony.

The target and the husband filed motions to intervene and motions to quash the subpoena duces tecum directed to the witness. Their motions contend that the target and husband are "aggrieved persons" within the meaning of § 2510(11) of Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (hereinafter "Title III" or "the Act"), 18 U.S.C. §§ 2510-2522, because they were parties to telephone communications unlawfully intercepted without their knowledge or consent. Citing § 2515 of Title III, the target and husband argue that the contents of the tapes cannot be disclosed to the grand jury because such disclosure would be a violation of § 2511(1)(c).

Although the witness appeared before the grand jury and answered some of the government's questions, she refused to produce the tapes. The government therefore moved to compel the witness' full compliance with both subpoenas. The district court granted the government's motion and, after further resistance from the witness, entered an order holding the witness in contempt. The district court also granted the target and husband's motions to intervene but denied their motions to quash.[3] While acknowledging that Doe 3's wiretap violated Title III, the court agreed with the government that the evidentiary prohibition of § 2515 contains a "clean hands" exception permitting the submission of evidence of unlawfully intercepted

_____

[3]The court did grant the motions to quash to the extent the subpoenas sought materials which would reveal confidential attorney-client or marital communications. The government did not oppose granting the motions with regard to these two privileges and these issues are not before us in this appeal.

communications to a grand jury where the violation was committed by a private party acting independent of the government.  The target and the husband then filed this appeal.[4]

### B.  Statutory Structure of Title III

"Title III's complex provisions regulate both interception and disclosure of communications in great detail." United States v. Cianfrani, 573 F.2d 835, 855 (3d Cir. 1978).  Various provisions of the Act are directly relevant to the jurisdictional and merits issues presented in this appeal.  Before proceeding to those issues, it will be useful to describe the statutory structure of Title III and to set out the provisions that are most important to this case.[5]

Section 2511(1)(a) makes it a crime for any person to intentionally intercept or endeavor to intercept any wire, oral, or electronic communication.  18 U.S.C. § 2511(1)(a); see also id. § 2510 (definitions).  Section 2511(1)(c) makes any disclosure of unlawfully intercepted communications a further

---

[4]This appeal presents solely questions of law, over which we exercise plenary review.  See United States v. Hayden, 64 F.3d 126, 128 (3d Cir. 1995).

[5]Most of the provisions not discussed in the text relate either to manufacture and confiscation of communication intercepting devices, 18 U.S.C. §§ 2512 & 2513, or to the procedures whereby government investigative and law enforcement officers can obtain authorization to intercept communications and disclose and use the contents of them, id. §§ 2516-2519.  Other sections provide for the Attorney General to seek an injunction against any person engaged in or about to engage in a felony violation of Title III, id. § 2521, and for a court authorizing an interception to order a noncomplying telecommunications carrier to comply with the order, id. § 2522.

violation of the statute. It provides for criminal punishment of any person who "intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection." Id. § 2511(1)(c). In addition to criminal sanctions against those who unlawfully intercept communications, the statute also provides a civil remedy. Under § 2520, "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity which engaged in that violation such relief as may be appropriate." Id. § 2520(a).

As a third remedy for violations of § 2511, "Title III contains a strict exclusionary rule," Cianfrani, 573 F.2d at 855, prohibiting use of intercepted wire or oral communications and the fruits thereof in specified proceedings, including, in particular, grand jury proceedings. Section 2515 provides that:

> Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

18 U.S.C. § 2515.

Finally, § 2518(10)(a)(i) authorizes any "aggrieved

person"—-that is, "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed," id. § 2510(11)—-to move to suppress the contents of any unlawfully intercepted communication.  It states:

> Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that--
>     (i) the communication was unlawfully intercepted . . . .

Id. § 2518(10)(a)(i).[6]

Here, the target and the husband claim to be aggrieved persons within the meaning of § 2510, and they seek to enforce § 2515's exclusionary rule to prohibit introduction to the grand jury of communications unlawfully intercepted by the witness.  In response, the government stresses that § 2518 does not list grand jury proceedings among the proceedings in which an aggrieved person may move to suppress evidence.  The government further contends that, even if the target and husband can properly move to enforce § 2515 in the context of a grand jury investigation, § 2515 contains a "clean hands" exception that permits disclosure to a grand jury of communications that were unlawfully

---

[6]Aggrieved persons may also move to suppress on the grounds that the communication was intercepted pursuant to a court authorization that was insufficient on its face or intercepted in a manner not in conformity with an appropriate authorization. See 18 U.S.C. § 2518(10)(a)(ii)-(iii).

7

intercepted by a private party without government complicity.

## II.  Standing and Jurisdiction

The government argues that the target and the husband lacked standing to proceed before the district court and now lack standing to proceed before us.  The government also claims that we have no jurisdiction because the district court's denial of Doe 1 and Doe 2's motions is not a final order.  We are unpersuaded by the government's arguments.  We conclude that the target and husband had standing to file their motion in the district court and that they continue to have standing to press this appeal.  Moreover, because the subpoena was not directed to them, the husband and target did not have the option of being held in contempt and creating an immediately appealable order.  Therefore, the denial of their motions to quash is a final order.

### A.  Standing

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute . . . ."  <u>Warth v. Seldin</u>, 422 U.S. 490, 498 (1975).  Here the government argues that neither the district court nor this court could decide the merits of Doe 1 and Doe 2's motions to quash the subpoena.

8

Both standing to sue and standing to appeal have constitutional as well as prudential elements.  See Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc., 913 F.2d 64, 70 n.3 (3d Cir. 1990) (referring to standing to sue); In re Grand Jury Matter (District Council 33), 770 F.2d 36, 39 (3d Cir. 1985) (standing to appeal); see also Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 471-76 (1982) (discussing constitutional and prudential standing requirements); Wheeler v. Travelers Ins. Co., 22 F.3d 534, 537-38 (3d Cir. 1994) (same).  The constitutional requirement of standing ensures that the "irreducible minimum" for Article III federal court jurisdiction, that there be "a case or controversy," is present.  Valley Forge, 454 U.S. at 472.  "Art. III requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and that the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision . . . ."  Id. at 472 (internal quotations and citations omitted).  Thus, the three requirements for constitutional standing are injury in fact, causation, and redressability.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

The same constitutional minima for standing to sue are also required for standing to appeal.  To ensure that the appeals court is hearing an actual case or controversy, the appellant must be aggrieved by the district court order.  See McLaughlin v.

9

<u>Pernsley</u>, 876 F.2d 308, 313 (3d Cir. 1989).

In the instant case, there can be no doubt that the target and husband meet the requirements for constitutional standing. Doe 1 and Doe 2 have had their telephone communications unlawfully intercepted and recorded by Doe 3, making them "aggrieved persons" within the meaning of Title III. 18 U.S.C. § 2510(11). The Act makes each disclosure of an unlawfully intercepted communication a separate violation, <u>see</u> <u>id.</u> § 2511(1)(c), so Doe 1 and Doe 2 would be injured in fact by further invasion of their privacy from disclosure of their communications to the grand jury.[7] The causes of this injury are the subpoena and the government's motion to compel, and the injury is redressable by quashing the subpoena. Since both intervenors remain aggrieved after the district court's disposition, the constitutional requirements for standing to appeal as well as standing to sue are satisfied.[8]

Whether the intervenors also satisfy the prudential

---

[7]"Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." <u>Linda R.S. v. Richard D.</u>, 410 U.S. 614, 617 n.3 (1973).

[8]That Doe 1 and Doe 2 satisfied the requirements for intervening in the district court does not automatically mean they also satisfy the constitutional requirements for appellate standing. <u>See</u> <u>Diamond v. Charles</u>, 476 U.S. 54, 68 (1986). "The relationship between the interests required for intervention in the district court and the interests required to confer Article III standing on appeal has not been clearly delineated." <u>McLaughlin</u>, 876 F.2d at 313-14. In the instant case, the government does not appeal the district court's ruling for appellants' on their motions to intervene. Hence, we are only reviewing whether Doe 1 and Doe 2 have standing, and this is not the occasion to attempt to clarify the relationship between the requirements for intervention and standing to appeal.

aspects of the standing requirement presents a more complex issue. Cf. Franchise Tax Board of California v. Alcan Aluminum Ltd., 493 U.S. 331, 336 (1990) (finding that respondents easily satisfied constitutional requirements for standing, but that more searching inquiry was necessary to determine if prudential requirements were also met). We recently described the concept of prudential standing in the following manner:

> Prudential considerations further limit a plaintiff's ability to establish that she has standing. These considerations require that: (1) a litigant "assert his [or her] own legal interests rather than those of third parties," (2) courts "refrain from adjudicating 'abstract questions of wide public significance' which amount to 'generalized grievances,'" and (3) a litigant demonstrate that her interests are arguably within the "zone of interests" intended to be protected by the statute, rule or constitutional provision on which the claim is based. The federal courts have adopted prudential limits on standing in order "to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim."

Wheeler, 22 F.3d at 538 (citations omitted).

None of the prudential concerns discussed in Wheeler bars the target and husband from having standing to sue or standing to appeal in this case. In both the district court and here, the intervenors are asserting their own legal interests under Title III. Although they seek to quash a subpoena directed to a third party, and though their success in quashing that subpoena would have legal consequences for the witness, the target and husband's claim is based on protecting their own

11

statutory right to privacy by preventing a further disclosure of their communications.[9] Their claim presents neither an abstract question nor a generalized grievance. Instead, it presents a precise question arising from a specific grievance about the use of grand jury subpoena power to compel production of recordings made in violation of the law. The privacy interests the target and husband assert are certainly within the "zone of interests" that Title III is intended to protect. Because it is Doe 1 and Doe 2 whose privacy has been violated and would again be violated by compliance with the subpoena, and since Doe 3 is the perpetrator of the unlawful recordings, it is the intervenors and not the witness herself who are best suited to assert the Title III claim. Recognizing standing in the target and husband in no way threatens to enmesh the federal courts in an action where no individual rights could be vindicated.

---

[9]Even if Doe 1 and Doe 2 are viewed as asserting the interests of Doe 3 and not of themselves, this would not necessarily deprive them of standing. We apply a balancing test to determine whether a litigant has prudential standing to bring an action on behalf of a third party. See Wheeler, 22 F.3d at 539 n.11. The factors we consider in applying this test include potential conflicts of interest between the litigant and the third party, obstacles to suit by the third party, and the closeness of the relationship between the litigant and the third party. See id. Since we conclude that the target and husband have prudential standing to assert their own interests under Title III, we need not decide whether they would have standing to assert the witness' interests.

The three prudential considerations we described in Wheeler are the three which are referred to most commonly in discussions of prudential standing.  See, e.g., Stehney v. Perry, 101 F.3d 925, 930-31 (3d Cir. 1996) (applying Wheeler considerations, finding that litigant satisfied all three, and concluding that litigant had prudential standing); UPS Worldwide Forwarding, Inc. v. United States Postal Serv., 66 F.3d 621, 626-31 (3d Cir. 1995) (same).  However, neither this court nor the Supreme Court has restricted the scope of prudential analysis to just these three considerations.  See generally Allen v. Wright, 468 U.S. 737, 751 (1984) ("Standing doctrine embraces several judicially self-imposed limits on the exercise of federal jurisdiction, such as [the three considerations listed in Wheeler].") (emphasis added).  Indeed, the Supreme Court has insisted that "standing in its outer dimensions is a prudential concept to be shaped by the decisions of the courts as a matter of sound judicial policy and subject to the control of Congress." Asarco Inc. v. Kadish, 490 U.S. 605, 613 (1989); see also Bennett v. Spear, ___ U.S. ___, 117 S. Ct. 1154, 1161 (1997) (stating that Congress can modify or abrogate prudential standing requirements).  This can only mean that lower courts, when confronted with a question of whether to recognize prudential standing in a particular litigant, must consider all factors relevant to making "sound judicial policy."

It is therefore appropriate to consider an additional prudential concern in determining whether to recognize standing in this case.  Specifically, we must consider whether finding

13

standing in Doe 1 and Doe 2 would unduly impede the grand jury investigatory process and thereby frustrate the public interest in fair and expeditious administration of the criminal laws. See generally United States v. Dionisio, 410 U.S. 1, 17 (1973). "As a necessary consequence of its investigatory function, the grand jury paints with a broad brush." United States v. R. Enterprises, Inc., 498 U.S. 292, 297 (1991). "Traditionally the grand jury has been accorded wide latitude to inquire into violations of criminal law." United States v. Calandra, 414 U.S. 338, 343 (1974). However, it is equally true that "the powers of the grand jury are not unlimited." Branzburg v. Hayes, 408 U.S. 665, 688 (1972); see also R. Enterprises, 498 U.S. at 299; Dionisio, 410 U.S. at 11. Just as grand juries must operate within the confines of the Constitution, see Branzburg, 408 U.S. at 708, so too must they comply with the limitations imposed on them by Congress (as long as those limitations are not unconstitutional).

We perceive two ways in which a recognition of standing here might be regarded as having a potential to impede the grand jury's investigative process. First, in those instances where a subpoena is quashed, this would, of course, deprive the grand jury of information it would otherwise have. But this kind of deprivation is properly attributable to Congress and cannot be cited as a prudential basis for denying standing. Congress decided when it adopted § 2515 that the grand jury is not permitted to receive the type of evidence sought by the subpoena here.

14

Second, a recognition of standing in situations such as this one will undoubtedly result in delays in grand jury investigations while trial courts are ruling on motions to quash and appellate courts are reviewing those rulings.  While we acknowledge the general undesirability of such delays, it is nevertheless true that motion to quash practice has not traditionally been regarded as an unreasonable burden on grand jury proceedings.  This is true whether the motion to quash is filed by the subject of a subpoena or by a third party with an important interest at stake.

The Supreme Court and this court have on several occasions allowed third parties to move to quash grand jury subpoenas directed to others.  See generally Stehney, 101 F.3d at 931 (after concluding that constitutional and prudential standing requirements were satisfied, stating that another reason for recognizing standing is that courts have done so for similarly-situated plaintiffs in other cases).  It is well-established that a litigant may have sufficiently important, legally-cognizable interests in the materials or testimony sought by a grand jury subpoena issued to another person to give the litigant standing to challenge the validity of that subpoena.  See, e.g., Gravel v. United States, 408 U.S. 606 (1972) (asserting constitutional privilege, U.S. Senator may move to intervene and quash subpoena directed at his assistant); In re Grand Jury Matter (JFK Hospital), 802 F.2d 96, 99 (3d Cir. 1986) (assuming intervenor has proprietary interest in third party's subpoenaed records, intervenor has standing to appeal denial of motion to quash

15

subpoena); District Council 33, 770 F.2d at 39 (same); In re Grand Jury Proceedings (FMC Corp.), 604 F.2d 798, 801 (3d Cir. 1979) (allowing nonsubpoenaed client to intervene and appeal order directed to subpoenaed attorney that affected attorney-client privilege); In re Grand Jury Investigation (Intervenor A), 587 F.2d 589, 594 (3d Cir. 1978) (asserting invasion of privilege, Representative has standing to intervene and move to quash subpoena directed to Clerk of House of Representatives); In the Matter of Grand Jury Impaneled Jan. 21, 1976 (Freedman), 541 F.2d 373, 377 (3d Cir. 1976) (holding that attorney has standing to intervene and challenge subpoena directed at prothonotary on basis of attorney's claim of privilege).

In In re Matter of Grand Jury (Schmidt), 619 F.2d 1022, 1026-27 (3d Cir. 1980), we discussed the types of interests that may be asserted by a party other than the subject of the grand jury subpoena if that party is to have standing to quash the subpoena.[10]  There a federal grand jury had directed subpoenas ad testificandum to six employees of Schmidt.  Schmidt moved to intervene and to quash the subpoenas, arguing that the grand jury was not investigating federal crimes and that the subpoenas were, therefore, abusive.  Prior to Schmidt, all of our cases recognizing intervenor standing to quash a subpoena directed at

----

[10]Schmidt's discussion of the intervenor-employer's standing to move to quash a subpoena directed at its employees does not distinguish between standing to sue and standing to appeal.  See 619 F.2d at 1026-27.  Yet, by deciding that the employer had standing to move to quash the subpoena, and by reaching the merits of its claims on appeal, we necessarily found that the employer had both standing to sue and standing to appeal.

another had involved intervenors with a property interest in, or claim of privilege respecting, the information or materials sought by the subpoena.  Thus, the government urged us to hold that standing in this context could only be present in those who could claim a property interest or privilege that had been (or would be) invaded by compliance with the subpoena.

We rejected this limitation as nonviable, explaining that we could imagine cases where other "valued rights" besides property or privilege would be affected and the intervenor would have standing.  Id. at 1026.  We concluded:

> Third party standing to assert claims of grand jury abuse cannot be determined by categorizing the claimed interest as one of property or privilege, but only by examining the nature of the abuse, and asking whether, and in what manner, it impinges upon the legitimate interests of the party allegedly abused.

Id. at 1027; see also United States v. Raineri, 670 F.2d 702, 712 (7th Cir. 1982) (citing Schmidt, explaining that "party has standing to move to quash a subpoena addressed to another if the subpoena infringes upon the movant's legitimate interests," and holding that prosecutor had standing to move to quash trial subpoena based on his interests in having trial proceed expeditiously and without harassment to witness or undue prejudice to his case); but see In re Subpoenas to Local 478, 708 F.2d 65, 72-73 (2d Cir. 1983) (criticizing Schmidt and saying that third party has standing to appeal denial of motion to quash only where district court's order affects "fundamental rights whose legal and practical value will be destroyed if not vindicated on collateral review").

17

Here, the interests asserted by the target and the husband can fairly be said to resemble a privilege. In light of Schmidt, however, we need not characterize their interests as such in order to find standing. While Schmidt involved a motion to quash a subpoena ad testificandum on the basis of alleged grand jury abuse in the form of investigation of non-federal crimes, Schmidt's reasoning, and particularly its rejection of restricting standing solely to property or privilege interests, applies beyond these narrow factual and legal circumstances.

Difficult questions may arise as to whether an intervenor's interest, if not a property interest or a privilege, is the kind of interest on which third party standing to quash a subpoena may be predicated, but we do not believe the instant case presents a difficult question. The husband and target have moved to quash the witness' subpoena in order to protect privacy interests created and protected by Title III. Title III is intended to give "maximum protection" to these privacy interests, Cianfrani, 573 F.2d at 857, interests which we have found "sufficiently weighty" to justify even limitations on the Sixth Amendment right of public access to court proceedings. Id. at 856-57 (ordering that pretrial hearings be closed to public to extent reasonably necessary to protect against disclosure of unlawfully intercepted communications). The Act protects the privacy interests asserted here by making it a crime for unlawfully intercepted communications to be disclosed to anyone, including the grand jury, § 2511(1)(c), and by additionally and explicitly prohibiting presentation of such evidence to a grand

18

jury, § 2515.  For the district court to compel enforcement of the subpoena would, if Doe 1 and Doe 2 are right on the merits, be in direct contradiction of these statutory provisions, and would therefore involve the district court in the commission of a federal crime.

We conclude that the privacy interests protected by Title III, which expressly include the interests in not having one's unlawfully intercepted communications disclosed to a grand jury or otherwise disclosed, are interests on which one may predicate standing to quash a subpoena, including a subpoena directed to another person.  Accordingly, we hold that Doe 1 and Doe 2 satisfy the constitutional and prudential requirements for both standing to sue and standing to appeal.

Before turning to the government's attack on our appellate jurisdiction, we pause to consider another contention the government advances, erroneously we think, as a standing argument.  It is that Doe 1 and Doe 2 are entitled to no relief because § 2518(10)(a)(i) does not authorize a motion to suppress in a grand jury proceeding.  We believe this is more accurately characterized as a contention that one in the position of Doe 1 and Doe 2 lacks a cause of action to seek the relief sought here.[11]  While we agree that § 2518(10)(a)(i) does not confer

_____

[11]See generally Davis v. Passman, 442 U.S. 228, 239 n.18 (1979) ("[S]tanding is a question of whether a plaintiff is sufficiently adversary to a defendant to create an Art. III case or controversy, or at least to overcome prudential limitations on federal-court jurisdiction, cause of action is a question of whether a particular plaintiff is a member of the class of litigants that may, as a matter of law, appropriately invoke the power of the court . . . .") (citations omitted).

19

upon Doe 1 and Doe 2 a right to secure a suppression order in the present context, we conclude that Federal Rule of Criminal Procedure 17(c) and the traditional motion to quash practice that it authorizes do confer upon them a cause of action to move to quash the subpoena duces tecum.

Under § 2518(10)(a)(i), an aggrieved person such as the target and the husband "may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter or evidence derived therefrom, on the grounds that . . . the communication was unlawfully intercepted."  Section 2518 lists a number of proceedings in which an aggrieved person may file such a motion to suppress, but grand jury proceedings are absent from this list.  Therefore, as we observed in a prior case, § 2518(10)(a) does not authorize a victim of an illegal wiretap to move to suppress unlawful Title III evidence before the grand jury.  See In re Grand Jury Proceedings (Egan), 450 F.2d 199, 206 (3d Cir. 1971), aff'd, Gelbard v. United States, 408 U.S. 41 (1972); see also United States v. Woods, 544 F.2d 242, 248 (6th Cir. 1976) (holding that § 2518(10)(a) does not authorize grand

jury target to file pre-indictment motion to suppress); <u>Dudley v. United States</u>, 427 F.2d 1140, 1141-42 (5th Cir. 1970) (same).

Here, however, Doe 1 and Doe 2 did not file motions to suppress. Instead, they filed motions to quash a subpoena. Federal Rule of Criminal Procedure 17(c) creates a right in specified circumstances to secure relief from a court in the form of an order quashing a grand jury subpoena <u>duces tecum</u>. Rule 17(c) states: "The court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive." Despite the importance of a generally unfettered grand jury investigative process, "the grand jury's subpoena power is not unlimited," <u>Calandra</u>, 414 U.S. at 346, and Rule 17(c) motions to quash are indisputably one of the "limit[s] imposed on a grand jury." <u>R. Enterprises</u>, 498 U.S. at 299; <u>see also Calandra</u>, 414 U.S. at 346 n.4. "Grand juries are subject to judicial control and subpoenas to motions to quash." <u>Branzburg</u>, 408 U.S. at 708; <u>see also In re Horn</u>, 976 F.2d 1314 (9th Cir. 1992) (granting attorney's Rule 17(c) motion to quash subpoena that was overbroad and unreasonable because compliance would violate attorney-client privilege).

There is nothing in the language or structure of Rule 17(c) or Title III suggesting that Rule 17(c) cannot be used by a victim of an unlawful interception to protect his or her privacy interests under Title III. We read Congress's decision not to authorize a motion to suppress evidence before the grand jury as nothing more than that. If Congress had also intended to prohibit third parties from using traditional motion to quash

21

practice to enforce their rights under Title III, we believe it would have done so by stating in Title III that § 2518(10)(a)(i) is the exclusive means of enforcing § 2515 in a grand jury context.[12]  We therefore hold that Rule 17(c) provides a cause of action for an aggrieved person to move to quash a grand jury

---

[12]The government relies heavily on the following statement in the legislative history:

> [Section 2518(10)(a)] must be read in connection with section[] 2515 . . . which it limits.  It provides the remedy for the right created by section 2515.  Because no person is a party as such to a grand jury proceeding, the provision does not envision the making of a motion to suppress in the context of such a proceeding itself.  Normally, there is no limitation on the character of evidence that may be presented to a grand jury, which is enforcible [sic] by an individual.  There is no intent to change this general rule.  It is the intent of the provision only that when a motion to suppress is granted in another context, its scope may include use in a future grand jury proceeding.

S. Rep. No. 90-1097, reprinted in 1968 U.S.C.C.A.N. 2112, 2195.

The drafter of § 2518(10)(a) clearly regarded a grand jury proceeding as something distinct from a court proceeding, and sought not to alter the general rule that motions to suppress cannot be filed in a pre-indictment setting.  The legislative history, like the Act itself, is silent on motions to quash. Nothing in the legislative history of § 2518(10)(a) suggests that Congress made a decision that traditional motion to quash practice before a court would be unavailable to an aggrieved party.  Nor has the government suggested any reason why Congress, after specifically prohibiting the use of illegally intercepted communications by a grand jury, might have wanted that practice to be unavailable.  In this connection, we note that Congress clearly did not intend that all persons aggrieved by grand jury conduct in violation of § 2515 have no remedy other than § 2518(10)(a).  As we have pointed out, § 2520 provides an aggrieved party with a civil action against a violator to recover "such relief as may be appropriate."  Moreover, as the Supreme Court held in Gelbard v. United States, 408 U.S. 41 (1972), it is entirely consistent with the Congressional intent behind Title III for those aggrieved persons who are the subject of a grand jury subpoena to simply refuse to comply and use § 2515 as a shield in the ensuing contempt proceeding.

22

subpoena <u>duces tecum</u> compliance with which would violate §§ 2515 and 2511(1)(c).

In reaching this conclusion, we reject the notion that there is something inherently inconsistent about a party having a right to quash a grand jury subpoena <u>duces tecum</u> when he or she has no right to move to suppress the evidence that is the subject of the subpoena. The relief that may result from the intervenors' motion to quash is equivalent to the relief that would result from a successful motion to suppress only because the government does not possess the evidence the grand jury has ordered to be produced. In the large number of cases where the government already has the evidence that an aggrieved person asserts cannot be introduced to the grand jury, a motion to quash will do the aggrieved person no good, because there will be no subpoena to be quashed. Here, however, the grand jury must employ its subpoena powers and the enforcement authority of the courts to obtain the evidence it seeks. We do not believe Congress intended the grand jury and the courts to use their respective powers to compel violations of Title III. When a subpoena is required to gain access to illegally intercepted communications, the independent checks on use of the subpoena power provide a cause of action to enforce the § 2515 evidentiary prohibition.

B. Final Order

In order for us to have appellate jurisdiction, the target and husband must not only have standing to appeal; the district court's order must also be a final order as to them. See JFK Hospital, 802 F.2d at 99; District Council 33, 770 F.2d at 38. Since we find that the denial of their motions to quash was a final order, we conclude that we have jurisdiction to reach the merits of this appeal.

An order denying a motion to quash is generally not a final order permitting immediate appellate review unless the movant is held in contempt. See United States v. Ryan, 402 U.S. 530 (1971); Cobbledick v. United States, 309 U.S. 323 (1940); Alexander v. United States, 201 U.S. 117 (1906). "Where, however, a person lacks the opportunity to contest the subpoena by disobedience because it is not directed to him or her, an order denying a motion to quash is final as to that individual." District Council 33, 770 F.2d at 38; see also Schmidt, 619 F.2d at 1024–25. "The court's order denying a motion to quash is effectively a final order to those who have no further steps they can follow." JFK Hospital, 802 F.2d at 98 (finding denial of motion to quash to be final order with respect to intervenors who could not proceed to contempt or order subject of subpoena to do so); see also District Council 33, 770 F.2d at 38 (same). When an intervenor does not have the option of contempt, the denial of an intervenor's motion to quash must be treated as final to provide effective appellate review, since the subject of the subpoena will frequently be unwilling to suffer the penalties of

24

contempt in order to protect the intervenor's interest.  See FMC Corp., 604 F.2d at 800-01.  Without immediate appeal, there would be no other proceeding in which the intervenor's claim could be asserted.  See Schmidt, 619 F.2d at 1025.

The district court's denial of Doe 1 and Doe 2's motions to quash is a final order as to them.  Since the subpoena is directed to Doe 3 and not to themselves, the target and husband do not have the option of creating an appealable order by standing in contempt.  Although the witness has, thus far, been willing to be held in contempt, she has done so on her own behalf, on grounds entirely different from those the intervenors have asserted.  There is no guarantee she will continue to accept contempt, and the target and husband's opportunity for appellate review should not be dependent on her willingness to do so.


### III.  Merits

We come, finally, to the merits of the intervenors' motions to quash the grand jury subpoena duces tecum issued to the witness.  The target and the husband contend that the motion must be quashed because compliance with it would constitute a violation of § 2515, prohibiting introduction to a grand jury of unlawfully intercepted communications, and of § 2511(1)(c), prohibiting disclosure of unlawfully intercepted communications.  We agree.

The government does not contest that compliance with a subpoena requiring a violation of §§ 2515 and 2511(1)(c) would be

"unreasonable" within the meaning of Federal Rule of Criminal Procedure 17(c). Nor does it dispute that compliance with the subpoena duces tecum currently before us would be a violation of the literal terms of §§ 2515 and 2511(1)(c). It could not in good faith contend otherwise. The language of § 2515 could not be any clearer: "Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any . . . proceeding . . . before any . . . grand jury . . . if the disclosure of that information would be in violation of this chapter." 18 U.S.C. § 2515. Section 2511(1)(c) is also unambiguous, making it a crime whenever one "intentionally discloses, or endeavors to disclose, to any person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection." Id. § 2511(1)(c). Since it is conceded by all parties that Doe 3's interceptions were made in violation of § 2511(1)(a), and disclosure of the contents of the intercepted communications would be a violation of § 2511(1)(c), the plain language of § 2515 prohibits use of the subpoenaed materials as grand jury evidence.

Yet, despite these concessions, the government insists that the district court properly denied Doe 1 and Doe 2 relief because there is an unarticulated "clean hands" exception to the strictures of §§ 2515 and 2511(1)(c). We are not persuaded.[13]

[13]We note that two other federal circuit courts have been

26

It is true, as the government emphasizes, that "in rare cases [where] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters," Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 570–71 (1982), we may look to those intentions rather than the literal terms of the statute. See also United States v. American Trucking Ass'ns, Inc., 310 U.S. 534, 542–44 (1940) ("When [a statute's plain] meaning has led to absurd or futile results . . . this Court has looked beyond the words to the purpose of the act. Frequently . . . even when the plain meaning did not produce absurd results but merely an unreasonable one plainly at variance with the policy of the legislation as a whole this Court has followed that purpose, rather than the literal words.") (internal quotations and footnotes omitted). This is not such a "rare case," however. Literal application of §§ 2515 and 2511(1)(c) means only that the grand jury cannot hear the contents of unlawfully intercepted communications. This protects the privacy of Doe 1 and Doe 2 from further invasions, consistent with the intent of Title III. Thus, application of the plain language of §§ 2515 and 2511(1)(c) leads to no absurd, futile, or even unreasonable result in this case. Cf. United States v. Underhill, 813 F.2d 105, 111–12 (6th Cir. 1987) (departing from plain language where it would allow defendant to shield himself

presented with the question of whether to read this same clean hands exception into § 2515 and have reached conflicting conclusions. See United States v. Murdock, 63 F.3d 1391 (6th Cir. 1995) (deciding that § 2515 does contain clean hands exception); United States v. Vest, 813 F.2d 477 (1st Cir. 1987) (rejecting clean hands exception).

27

from prosecution under anti-gambling statute by suppressing communications he unlawfully intercepted to further illicit gambling scheme, clearly an absurd and unintended result of Title III).

Even if we were prepared to ignore the literal language of the statute, however, we find no other indication that Congress intended the clean hands exception the government would have us read into §§ 2515 and 2511(1)(c).  The statutory structure makes it clear that any interceptions of communications and invasions of individual privacy are prohibited unless expressly authorized in Title III.  See Gelbard, 408 U.S. at 46; Cianfrani, 573 F.2d at 855.  The invasion of Doe 1 and Doe 2's privacy that would result from introduction of Doe 3's recordings to the grand jury is nowhere expressly authorized under Title III, clearly suggesting that Congress intended no clean hands exception.

The government cites a statement in the legislative history, to the effect that "[t]he perpetrator must be denied the fruits of his unlawful actions in civil and criminal proceedings," 1968 U.S.C.C.A.N. at 2156, to support its contention that Congress did not intend to deprive the government of the use of unlawful evidence when the government is not the "perpetrator" of the illegal interception.  But this statement evidences no intent that a non-perpetrator may use the fruits of another's unlawful actions.  To the contrary, the statute and its legislative history provide that anyone who discloses the contents of a communication knowing it to be the fruit of an

28

illegal invasion of privacy is guilty of a criminal offense, see 18 U.S.C. § 2511(1)(c); 1968 U.S.C.C.A.N. at 2181–82, and likewise § 2515's evidentiary prohibition must be applied to perpetrators and non-perpetrators alike.

Moreover, if we were to concern ourselves with the cleanliness of hands, there would be no reason to limit our consideration to the hands of the government alone. It is the grand jury that issued the subpoena, and it is the district court that ordered it to be enforced. Given the unambiguous language of § 2515, compliance with the subpoena would be a violation of an express congressional prohibition. Were we to allow a compelled violation of this federal law, the hands of the grand jury, the district court, and ourselves would all become sullied. See Egan, 450 F.2d at 209 ("It seems beyond question that a district court may not compel the violation of an express congressional prohibition."). Since § 2515 was enacted, in part, "to protect the integrity of court . . . proceedings," Gelbard, 408 U.S. at 51 (internal quotations omitted), Congress cannot have intended that we ignore any taint on grand jury and judicial hands. In short, it is incomprehensible that Congress intended the admissibility of unlawfully intercepted communications to

turn solely on whether the government participated in the interceptions.

We agree with the intervenors that, when enacting Title III, Congress performed all of the balancing necessary of the public interest in law enforcement against the privacy interests of citizens. As we said in Cianfrani,

> Congress's overriding interest in protecting privacy to the maximum extent possible is evident in Title III. The legislative history of the statute emphasizes the concern of its drafters that the Act preserve as much as could be preserved of the privacy of communications, consistent with the legitimate law enforcement needs that the statute also sought to effectuate. Similarly, the complex and overlapping provisions are strong evidence that Congress intended to regulate strictly disclosure of intercepted communications, limiting the public revelation of even interceptions obtained in accordance with the Act to certain narrowly defined circumstances.

573 F.2d at 856. We have no authority to restrike the balance that Congress has already struck by placing in the statute a clean hands exception that Congress did not.

In sum, Title III is designed to protect the privacy of communications and the integrity of the courts. Compliance with the subpoena duces tecum directed to Doe 3 would violate § 2515's evidentiary prohibition and would work a further invasion of Doe 1 and Doe 2's privacy rights in violation of § 2511(1)(c). Compliance with the subpoena would, therefore, be unreasonable, and the subpoena must be quashed.

30

## IV.  Conclusion

For the foregoing reasons, we will reverse the district court, and remand with an order to grant the intervenors' motions to quash the subpoena duces tecum.

In re Grand Jury, Nos. 97-7016/17


SLOVITER, dissenting.

I do not disagree with the proposition that a person aggrieved under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, codified as amended at 18 U.S.C. §§ 2510-2522 ("Title III"), should have the right to preclude the use of illegally intercepted communications at a criminal proceeding, whether or not the government was responsible for the interception.  Nor do I disagree with the proposition that such a person should have the right at an appropriate time to quash a subpoena issued to a third person ordering production of such communications.  However, I do disagree with the majority's holding that a third party, such as a target or subject of a grand jury investigation, may move to quash the subpoena issued to a witness during the grand jury investigation.  This holding runs counter to the well-established precedent disallowing procedures that would delay and disrupt grand jury proceedings.  While I share the majority's disapproval of the witness's actions in illegally intercepting communications, I believe that the majority's interpretation of Title III is contrary to the statutory framework and the prudential principles underlying the statute.  Therefore, I respectfully dissent and would affirm the

31

district court's dismissal of the intervenors' motions to quash for lack of standing.

**A.**

My difference with the majority is narrow insofar as the scope of the substantive provisions of Title III are concerned, but fundamental insofar as its enforcement provisions are concerned. As the majority points out, § 2515 provides a categorical exclusionary remedy for violations of Title III, expressly proscribing the admission of illegally wiretapped evidence in various specified proceedings, including grand jury proceedings. But the exclusionary remedy of § 2515 is not self-executing. The legislative history of Title III explains that § 2515 "must, of course, be read in light of § 2518(10)(a) . . . , which defines the class entitled to make a motion to suppress." S. Rep. No. 90-1097 (1968), reprinted in 1968 U.S.C.C.A.N. 2112, 2185 ["Senate Report"]. Significantly, § 2518(10)(a) does not list a grand jury investigation among the list of specified proceedings in which suppression motions may be filed.

It is this tension between the two sections that forms the basis of my difference with the majority. I believe that we are bound by the statutory language, and that what appears to be a paradoxical result – one section granting a right and the other withholding a remedy – is reconcilable by a literal reading of the statute and the explanation given in the legislative history. Congress saw the two provisions as dependent and reflexive; Congress intended § 2518(10)(a) to restrict § 2515. The Senate Report states that § 2518(10)(a) "must be read in connection with sections 2515 and 2517, . . . which it limits. It provides the remedy for the right created by

33

section 2515." Id. at 2195.

By relying on Rule 17(c) of the Federal Rules of Criminal Procedure, the majority glides over the fact that § 2518(10)(a), which gives aggrieved persons the right to file motions to suppress such intercepted communications at various proceedings, conspicuously omits proceedings before the grand jury. Rule 17(c) governs motions to quash subpoenas when "compliance would be unreasonable or oppressive." Fed. R. Crim. P. 17(c). But a rule cannot trump a statute, and the majority's solution undermines the clearly discernible policy goal of § 2518(10)(a)'s limitation on the filing of motions to suppress, namely, to prevent interference and delay with grand jury investigations. This policy applies with equal force to the filing of motions to quash.

The reason for the omission of grand jury proceedings from the suppression provision of § 2518(10)(a) is set forth in the Senate Report, which states:

> Because no person is a party as such to a grand jury proceeding, the provision does not envision the making of a motion to suppress in the context of such a proceeding itself. Normally there is no limitation on the character of evidence that may be presented to a grand jury, which is enforceable by an individual. (*Blue v. United States*, 86 S.Ct. 1416, 384 U.S. 251 (1965).) There is no intent to change this general rule.

S. Rep. No. 90-1097, reprinted in 1968 U.S.C.C.A.N. at 2195 (emphasis added).

It was this policy and similar explanations in the

34

legislative history commenting on the language of Title III that led the Supreme Court in Gelbard v. United States, 408 U.S. 41 (1972), a case on which the majority relies, to distinguish between a grand jury witness who seeks to stand on the illegality of the interception as a basis for refusal to answer and a non-witness potential defendant who seeks to intrude into the grand jury proceedings.  After undertaking a thorough analysis of the legislative history of Title III, the Court held that a witness in a grand jury proceeding who was cited for contempt for refusal to answer questions that were based upon illegally intercepted communications could use the suppression provision of § 2515 as a "just cause" defense.  See Gelbard, 408 U.S. at 59.  The Court concluded that a witness was not foreclosed from using § 2515's remedy only because that witness was not a target of a grand jury investigation.  See id.  The Court stated in broad terms equally applicable here,

> The congressional concern with the applicability of § 2518(10)(a) in grand jury proceedings, so far as it is discernible from the Senate report, was apparently that defendants and potential defendants might be able to utilize suppression motions to impede the issuance of indictments. . . .

Id. at 59-60 (emphasis added).

As the court commented in United States v. Woods, 544 F.2d 242, 249 (6th Cir. 1976), cert. denied, 431 U.S. 954 (1977),  Gelbard "drew a careful distinction between a witness before the grand jury, who it held may refuse to answer questions based upon illegal interceptions, and a defendant or potential

35

defendant."

The "general rule" referred to in the Senate Report and incorporated into the statute was described in United States v. Blue, 384 U.S. 251 (1966), a case in which a defendant sought pretrial dismissal of his indictment on tax fraud charges on the ground that it was procured in violation of his Fifth Amendment right against self-incrimination. The district court granted the motion, but the Supreme Court reversed. It explained that because criminal defendants have an opportunity to vindicate their rights at trial, they should not be permitted to interrupt the normal progress of a grand jury investigation. Id. at 255 (commenting that because tainted evidence is admissible in grand jury proceedings a defendant would only be able to suppress such evidence or "its fruits if they were sought to be used against him at trial").

The Senate Report accompanying Title III cited to Blue, a reference that was noted by the Supreme Court in Gelbard, 408 U.S. at 60. Gelbard affirmed our decision in In re Grand Jury (Egan), 450 F.2d 199 (3d Cir. 1971), where we stated:

> The reference in the legislative history [of Title III] to Blue demonstrates at most a congressional intent to preclude an attack on a grand jury investigation by one whose interest in such investigation is not as a witness, but as a defendant, and instead to require such person to move for the exclusion of the questionable evidence after the indictment or at a time designated by the rules of criminal procedure.

Egan, 450 F.2d at 205. We held that Sister Egan, a witness who

refused to answer questions in a grand jury proceeding, could invoke the § 2515 remedy because she was not a prospective defendant, and thus was "not attempting to block an indictment that might be returned by the grand jury, but rather is asserting her right as a citizen to vindicate her privilege." Id. at 205–06.

The structure of the relevant provisions of Title III and its legislative history show that Congress intended to prevent targets and subjects of grand jury investigations, who would have the opportunity to challenge illegally intercepted communications at trial, from filing any motions that would inhibit the functioning of the grand jury.

It is true, as the majority notes, that motions to quash are not expressly proscribed by Title III. However, in light of Congress's emphasis on protecting the uninterrupted functioning of the grand jury, we must interpret Title III in a way that channels motions to quash a subpoena duces tecum, like motions to suppress, to trial proceedings, rather than to grand jury proceedings. The inclusion of grand jury proceedings in the exclusionary remedy of § 2515 entitles a grand jury witness, but not third parties, to rely on that provision.

The congressional intentions behind Title III flow from the unique role occupied by the grand jury. It conducts an inquisitorial proceeding that seeks to determine if a crime has been committed or if criminal charges should be brought against any person, rather than an adversarial proceeding in which guilt or innocence is determined. See United States v. R. Enterprises,

37

<u>Inc.</u>, 498 U.S. 292, 297 (1991).

Consistent with this function, numerous procedures are permitted in the grand jury that would not be acceptable in a criminal trial. The grand jury "paints with a broad brush," <u>id.</u>, and the scope of its investigative power is necessarily very broad. <u>See</u> <u>Branzburg v. Hayes</u>, 408 U.S. 665, 701 (1972) ("A grand jury investigation is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed." (internal quotations omitted)). It conducts its investigation in the absence of a judge, deliberates in secret, and is not restrained by the technical rules of procedure and evidence that govern criminal trials. <u>See</u> <u>United States v. Calandra</u>, 414 U.S. 338, 344 (1974).

As the Supreme Court said of the grand jury nearly eighty years ago:

It is a grand inquest, a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime.

<u>Blair v. United States</u>, 250 U.S. 273, 282 (1919) (witness not entitled to make objections based on irrelevance or incompetence); <u>see</u> <u>also</u> <u>Costello v. United States</u>, 350 U.S. 359, 364 (1956) (hearsay rules inapplicable to grand jury proceedings because strict observance of such rules "would result in

38

interminable delay but add nothing to the assurance of a fair trial"); Lawn v. United States, 335 U.S. 339–350 (1958) (indictment not open to challenge on ground that it was procured in violation of Fifth Amendment).

Solicitude for the proper and efficient functioning of the grand jury has made the Court reluctant to authorize procedures that would allow "protracted interruption of grand jury proceedings." Gelbard, 408 U.S. at 70 (White, J., concurring). Thus, in Calandra, the Court held that the exclusionary rule for alleged Fourth Amendment violations would not be available at the grand jury stage because the hearings necessitated by such a rule "would halt the orderly progress of an investigation and might necessitate extended litigation of issues only tangentially related to the grand jury's primary objective." 414 U.S. at 349.

In R. Enterprises, the Court held that the standards set out in United States v. Nixon, 418 U.S. 683, 699–700 (1974), for relevancy and admissibility of documents sought by a subpoena duces tecum in the trial stage were not applicable at the grand jury stage because such rules would invite unacceptable "procedural delays and detours." R. Enterprises, 498 U.S. at 298. After noting that "We have expressly stated that grand jury proceedings should be free of such delays," the Court quoted United States v. Dionisio, 410 U.S. 1, 17 (1973), for the proposition that: "'Any holding that would straddle a grand jury with minitrials and preliminary showings would assuredly impede its investigation and frustrate the public's

interest in the fair and expeditious administration of the criminal laws.'" Id. at 298–99 (quoting Dionisio, 410 U.S. at 17).

If intervenors were permitted to file motions to quash subpoenas duces tecum, the grand jury would be straddled with precisely the delay and disruption that Congress sought to avoid. There are numerous potential issues for side litigation in a statute as complex as Title III, such as whether an intervenor was an "aggrieved person" according to § 2510(11) or whether there was in fact a statutory violation under § 2511. The majority's ruling would require adversarial hearings on matters peripheral to the grand jury's investigation and could effectively transform the grand jury proceeding into a "preliminary trial[] on the merits" in a way that the Court in Calandra found unacceptable. Calandra, 414 U.S. at 350. The consequential appeal, as here, if an intervenor has standing will necessarily produce further unacceptable delays in the grand jury's work.

I am not convinced that the delay and disruption to the grand jury proceedings that the majority's holding will cause are offset by the benefits of the majority's ruling. Allowing parties to exclude such evidence at the grand jury stage will do little to prevent future violations of the statute, particularly among private citizens. See Calandra, 414 U.S. at 351 ("[a]ny incremental deterrent effect which might be achieved by extending the [exclusionary] rule to grand jury proceedings is uncertain at best"). And Congress's effort to protect an

40

aggrieved person from the disclosure of illegally intercepted communications, repeatedly stressed by appellants, must be viewed in the context of Congress's evident contemplation that such communications would indeed be disclosed in grand jury proceedings by its exclusion from § 2518(10)(a) of motions to suppress before the grand jury.

As a result, I believe that under Title III third-party motions to quash, like motions to suppress, are precluded at the grand jury stage in the interest of the efficient administration of the grand jury process.

## B.

As the majority correctly notes, there have been cases in which third parties have been accorded standing to file motions to quash grand jury subpoenas where a privilege accorded by the Constitution, a statute, or common law was at stake. See, e.g., Gravel v. United States, 408 U.S. 606 (1972) (speech and debate clause privilege entitled U.S. Senator to quash subpoena directed at aide); In re Grand Jury Proceedings (FMC Corp.), 604 F.2d 798, 801 (3d Cir. 1979) (allowing client to intervene to challenge subpoena issued to attorney); see also In re Grand Jury Matter (John F. Kennedy Memorial Hospital), 802 F.2d 96, 99(3d Cir. 1986) (third parties accorded standing where their property interests were jeopardized). In those situations, the protection afforded by the privilege is destroyed as soon as the privileged material is introduced, whether at the grand jury or at trial. Communications illegally intercepted are not in the same position because, as set forth in the prior section, Congress recognized

41

that disclosure of those communications would occur at the grand jury stage when it limited the suppression remedy by omitting the grand jury in § 2518(10)(a).

The majority relies on dictum from In re Matter of Grand Jury (C. Schmidt & Sons, Inc.), 619 F.2d 1022, 1026–27 (3d Cir. 1980), where there was reference in the majority opinion to "imagined" instances where other "valued rights" at stake would trigger third party standing to quash subpoenas. Id. at 1026; but see In re Subpoena to Local 478, 708 F.2d 65, 73 (2d Cir. 1983) (Schmidt "lacks a limiting principle"). In Schmidt, where we granted third-party standing, there were a variety of interests asserted by the third-party intervenor, including the contractual property interest in the service of employees who were subject to a subpoena ad testificandum, a property interest in the books and records previously subpoenaed, and, most fundamentally, the right not to be subject to abuse of the grand jury's process. In the latter instance, a third-party motion to quash is the only mechanism available to challenge the potential abuse. None of these considerations is applicable here where there is no allegation of grand jury abuse. Therefore, the usual presumption accorded to the legitimacy of grand jury proceedings applies. See R. Enterprises, 498 U.S. at 300.

Unlike the third parties hypothesized in Schmidt, the intervenors here will have an opportunity to challenge the statutory violation through a motion to quash or to suppress the resulting evidence at the start of their criminal trial should an indictment against them emerge from the grand jury. They also

42

have the right, under the statute, to sue the interceptor of the illegal wiretap for civil damages whether or not they are ultimately indicted, see § 2520(a), and can file a complaint leading to a criminal prosecution of the interceptor, see 2511(1)(c).

### C.

In sum, I conclude that the statutory framework of Title III as well as congressional intentions regarding the appropriate mechanisms to redress violations of Title III foreclose the intervenors from filing motions to quash subpoena duces tecum issued as part of a grand jury investigation. Accordingly, I would affirm the district court's dismissal of the intervenors' motions.